ROBBINS GELLER RUDMAN
  & DOWD LLP
BENNY C. GOODMAN III (211302)
RACHEL L. JENSEN (211456)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
bennyg@rgrdlaw.com
rachelj@rgrdlaw.com
  – and –
PAUL J. GELLER
STUART A. DAVIDSON
120 E. Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com
sdavidson@rgrdlaw.com
  – and –
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

CARELLA, BYRNE, CECCHI,
  OLSTEIN, BRODY & AGNELLO, P.C.
JAMES E. CECCHI
LINDSEY H. TAYLOR
5 Becker Farm Road
Roseland, NJ 07068
Telephone: 973/994-1700
973/994-1744 (fax)
jcecchi@carellabyrne.com
ltaylor@carellabyrne.com

SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
STEPHEN A. WEISS
77 Water Street, 8th Floor
New York, NY 10005
Telephone: 212/584-0700
212/584-0799 (fax)
cseeger@seegerweiss.com
sweiss@seegerweiss.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PIGMENT INC., Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>    vs.<br><br>THE HARTFORD FINANCIAL SERVICES GROUP, INC. and SENTINEL INSURANCE COMPANY, LTD.,<br><br>               Defendants. | Case No. '20CV0794 BEN JLB<br><br>CLASS ACTION<br><br>COMPLAINT FOR DECLARATORY JUDGMENT AND BREACH OF CONTRACT<br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff Pigment Inc. ("plaintiff"), on behalf of itself and all others similarly situated, brings this class action against defendants The Hartford Financial Services Group, Inc. and Sentinel Insurance Company, Ltd. (together, "Defendants" or "Hartford"), and alleges as follows based on personal knowledge as to itself and upon information and belief as to other matters based on its counsel's investigation. Plaintiff believes additional evidentiary support exists for its allegations, given an opportunity for discovery.

## SUMMARY OF THE ACTION

1.     Plaintiff and other businesses nationwide purchased commercial property insurance to ensure that they would not be forced to close their doors for good if they were shuttered temporarily by an unanticipated crisis.  Such a crisis is now upon us, but Hartford and other insurers are refusing to pay the claims.

2.     On March 11, 2020, the World Health Organization's ("WHO") Director General, Tedros Adhanom Ghebreyesus, declared the COVID-19 outbreak a worldwide pandemic: "WHO has been assessing this outbreak around the clock and we are deeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction.  We have therefore made the assessment that COVID-19 can be characterized as a pandemic."[1]

3.     On March 13, 2020, President Trump declared the COVID-19 pandemic to be a national emergency.[2]  On March 16, 2020, the Centers for Disease Control and Prevention ("CDC") and members of the national Coronavirus Task Force issued guidance to the American public, styled as "30 Days to Slow the Spread," for stopping

---

[1]   *See* World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[2]   *See* The White House, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

the spread of COVID-19.  This guidance advised individuals to adopt social distancing measures, such as working from home, avoiding shopping trips, avoiding gatherings of more than 10 people, and staying away from bars, restaurants, and food courts.[3]

4.     On March 12, 2020, California Governor Gavin Newsom issued a civil authority order directing California residents to cancel non-essential gatherings.  On March 19, 2020, Gov. Newsom issued Executive Order N-33-20, a civil authority order that required all residents to stay home, except as needed to maintain federal critical infrastructure sectors.  All California businesses not deemed essential, including plaintiff's retail locations, have been ordered to close their doors.

5.     In addition to California, the vast majority of other states across the nation have entered civil authority orders requiring residents to "stay-at-home" or "shelter-in-place" and suspending or severely curtailing business operations of non-essential businesses that interact with the public and/or provide social gathering places for residents (collectively, the "COVID-19 Civil Authority Orders").

6.     These far-reaching COVID-19 Civil Authority Orders have been financially devastating for most non-essential businesses, especially restaurants and other foodservice businesses, as well as retail establishments, entertainment venues, and other small, medium, and large businesses who have been forced to close, furlough employees, and endure a sudden shutdown of cash flow that threatens their survival.

7.     Many businesses have purchased insurance to protect against losses from catastrophic events like the current unforeseen COVID-19 pandemic through all-risk commercial property insurance policies.  These policies promise to indemnify the policyholder for actual business losses incurred when business operations are

---

[3]  *See* The White House, *The President's Coronavirus Guidelines for America, 30 Days to Slow the Spread,* https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf (last visited Apr. 27, 2020).

involuntarily suspended, interrupted, curtailed, when access to the premises is prohibited because of direct physical loss or damage to the property, or by a civil authority order that restricts or prohibits access to the property.  This coverage, commonly known as "business interruption coverage, is standard in most all-risk commercial property insurance policies.

8.     Despite the provision of business interruption coverage in these policies, Defendants are denying their obligation to pay for business income losses and other covered expenses incurred by policyholders for the physical loss and damage to the insured property arising from COVID-19 Civil Authority Orders put in place as a precaution to slow the contagion.

9.     Plaintiff now brings this action on behalf of a Nationwide Class and a California Sub-Class (as defined below) of policyholders who purchased standard Hartford commercial property insurance to insure property in the United States and California, respectively, where such policies provide for business income loss and extra expense coverage and do not exclude coverage for pandemics, and who have suffered losses due to measures put into place by a COVID-19 Civil Authority Order.

10.     This action seeks a declaratory judgment that Hartford is contractually obligated to pay business interruption losses incurred due to plaintiff's and other Class members' compliance with COVID-19 Civil Authority Orders.  In addition, plaintiff seeks damages, attorneys' fees and costs, and any other relief that this Court deems equitable and just, arising out of Hartford's breach of contract and wrongful  conduct alleged herein.

## PARTIES

11.     Plaintiff Pigment Inc. ("Pigment") is a California corporation with its principal place of business in San Diego, California.  Pigment operates several retail stores in San Diego County that sell artisan-crafted home goods, furniture, and plants and host community workshops and events.  Pigment's success depends upon patrons being able to shop and attend events at its retail businesses.  In March 2020, Pigment

1  was forced to close its retail locations due to the issuance of applicable COVID-19

2  Civil Authority Orders.

3        12.    Defendant The Hartford Financial Services Group, Inc. ("Hartford

4  Financial") is a Delaware corporation with its principal place of business in Hartford,

5  Connecticut.  It owns subsidiaries, directly and indirectly, that issue, among other

6  things, property insurance.

7        13.    Defendant Sentinel Insurance Company, Ltd. ("Sentinel") is a

8  Connecticut corporation with its principal place of business in Hartford, Connecticut.

9  Sentinel is a subsidiary of Hartford and is duly qualified and licensed to issue

10  insurance in the State of California and other states.

11        14.    Sentinel and Hartford Financial are referred to herein collectively as

12  "Defendants" or "Hartford."

13        15.    Sentinel issued the Hartford Policy No. 72 SBA UU6772 to Pigment for

14  the policy period of February 15, 2020, through February 15, 2021 ("Plaintiff's

15  Hartford Policy").

16                          **JURISDICTION AND VENUE**

17        16.    This Court has jurisdiction over this action pursuant to 28 U.S.C.

18  §1332(d) in that this is a class action in which the amount in controversy exceeds

19  $5,000,000, exclusive of interest and costs, and plaintiff and at least one member of

20  the putative class is a citizen of a different state than the Defendants.

21        17.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) in that

22  plaintiff is located in this District and Defendants do business in this District and thus

23  reside in this District, in accordance with 28 U.S.C. §1391(c).

24                          **FACTUAL BACKGROUND**

25  **A.    The Global COVID-19 Pandemic**

26        18.    Viruses of the family Coronaviridae, such as Middle East respiratory

27  syndrome (MERS) coronavirus (MERS-CoV) and severe acute respiratory syndrome

28

                                    - 4 -

1  (SARS) coronavirus (SARS-CoV), have been responsible for the loss of human life

2  since at least 2002 and were identified in several animal hosts.[4]

3      19.    In December 2019, an initial cluster of nine patients with an unknown

4  cause of viral pneumonia was linked to the Huanan seafood market in Wuhan, China,

5  where many non-aquatic animals such as birds were also on sale.  However, one of the

6  patients never visited the market, though he had stayed in a hotel nearby before the

7  onset of the illness.[5]

8      20.    By January 2020, genetic sequencing from patient samples was

9  conducted to identify a novel virus, SARS-CoV-2, as the causative agent for the

10  pneumonia cluster.[6]  SARS-CoV-2 is an RNA virus, with a crown-like appearance

11  under an electron microscope because of glycoprotein spikes on its envelope.  Among

12

13  _____

[4]  *See* Roujian Lu, et al., Center for Disease Control, *Genomic characterisation and

14  epidemiology of 2019 novel coronavirus: implications for virus origins and receptor

binding* (Jan. 29, 2020), https://www.cdc.gov/coronavirus/2019-

15  ncov/downloads/genomic-characterization-of-2019-nCoV-Lancet-1-29-2020.pdf

(There are four genera of coronaviruses: (I) α-coronavirus (alphaCoV) and (II) β-

16  coronavirus (betaCoV), which are probably present in bats and rodents; and (III) δ-

coronavirus (deltaCoV) and (IV) γ-coronavirus (gammaCoV), which probably

17  represent avian species.).

18  [5]  *See* Francesco Di Gennaro et al., MDPI: International Journal of Environmental

Research and Public Health, *Coronavirus Diseases (COVID-19) Current Status and

19  Future Perspectives a Narrative Review* (Apr. 1, 2020), https://www.mdpi.com/1660-

4601/17/8/2690 (As a typical RNA virus, the average evolutionary rate for

20  coronaviruses is roughly 10-nucleotide substitutions per site per year, with mutations

arising during every replication cycle.  This finding suggests that COVID-19

21  originated from one source within a short period and was detected rapidly.  However,

as the virus transmits to more individuals. constant surveillance of arising mutations is

22  needed.); Roujian Lu, et al., Center for Disease Control, *Genomic characterisation

and epidemiology of 2019 novel coronavirus: implications for virus origins and

23  receptor binding* (Jan. 29, 2020), https://www.cdc.gov/coronavirus/2019-

ncov/downloads/genomic-characterization-of-2019-nCoV-Lancet-1-29-2020.pdf,

24  (This finding suggests either possible droplet transmission or that the patient was

infected by a currently unknown source. Evidence of clusters of infected family

25  members and medical workers has now confirmed the presence of human-to-human

transmission.).

26  [6]  *See* Francesco Di Gennaro et al., MDPI: International Journal of Environmental

Research and Public Health, *Coronavirus Diseases (COVID-19) Current Status and

27  Future Perspectives a Narrative Review* (Apr. 1, 2020), https://www.mdpi.com/1660-

4601/17/8/2690.

28

the functions of the structural proteins, the envelope has a crucial role in virus pathogenicity as it promotes viral assembly and release.[7]

21. The first confirmed case of the virus outside China was diagnosed on January 13, 2020, in Bangkok, Thailand with the number of cases rapidly increasing worldwide.

22. On January 30, 2020, WHO declared that the SARS-COv-2 outbreak constituted a public health emergency of international concern.

23. By February 11, 2020, the novel coronavirus was named "COVID-19" by the WHO Director-General.[8]

24. As of April 27, 2020, the number of confirmed cases of COVID-19 topped 3 million globally with over 200,000 deaths, with the United States dealing with nearly 1 million confirmed cases and over 55,000 reported deaths – more than any other country in the world.[9]

25. The clinical features of COVID-19 vary from asymptomatic forms to fatal conditions of severe respiratory failure that require ventilation and support in an intensive care unit ("ICU"). Pneumonia has been the most frequent severe manifestation of COVID-19, with symptoms of fever, cough, dyspnea, and bilateral infiltrates on chest imaging.[10] There are no specific treatments recommended for COVID-19, and no vaccine is currently available.[11]

---

[7] *See id.* (To address the pathogenetic mechanisms of SARS-CoV-2, its viral structure and genome must be considered. Coronaviruses are enveloped positive strand RNA viruses with the largest known RNA genomes – 30-32 kb – with a 50-cap structure and 30-poly-A tail.).

[8] *See id.*

[9] *See* Lateshia Beachum et al., Wash. Post, *Live updates: States lay out plans to reopen as coronavirus cases surpass 3 million worldwide* (Apr. 27, 2020), https://www.washingtonpost.com/world/2020/04/27/coronavirus-latest-news/.

[10] *See* Francesco Di Gennaro et al., MDPI: International Journal of Environmental Research and Public Health, *Coronavirus Diseases (COVID-19) Current Status and Future Perspectives a Narrative Review* (Apr. 1, 2020), https://www.mdpi.com/1660-4601/17/8/2690 (Asymptomatic infections have also been described, but their frequency is unknown. Other, less common symptoms have included headaches, sore

- 6 -

26.     It has now been discovered by scientists that COVID-19 has several modes of transmission.  Pursuant to a "Situation Report" released by the WHO, the virus can be transmitted through symptomatic transmission, pre-symptomatic transmission, and asymptomatic transmission.[12]  Symptomatic transmission refers to transmission by a person experiencing symptoms associated with the virus who then transfers COVID-19 to another.  Data from published studies provide evidence that COVID-19 is primarily transmitted from symptomatic persons to others who are in close contact through respiratory droplets, by direct contact with infected persons, or by contact with contaminated objects and surfaces.[13]

27.     The incubation period for COVID-19 – the time between exposure to the virus (becoming infected) and symptom onset – is an average of 5-6 days, but can take up to 14 days.[14]  During this period, also known as the "pre-symptomatic" period, some infected persons can be contagious.  For that reason, transmission from a pre-

---

throat, and rhinorrhea. Along with respiratory symptoms, gastrointestinal symptoms (*e.g.*, nausea and diarrhea) have also been reported, and in some patients, they may be the presenting complaint.).

[11]   *See id*. (The treatment is symptomatic, and oxygen therapy represents the major treatment intervention for patients with severe infection.  Mechanical ventilation may be necessary in cases of respiratory failure refractory to oxygen therapy, whereas hemodynamic support is essential for managing septic shock.  Different strategies can be used depending on the severity of the patient and local epidemiology.  Home management is appropriate for asymptomatic or paucisintomatic patients.  They need a daily assessment of body temperature, blood pressure, oxygen saturation and respiratory symptoms for about 14 days. Management of such patients should focus on prevention of transmission to others and monitoring for clinical status with prompt hospitalization if needed.).

[12]   *See World Health Organization, Coronavirus disease 2019 (COVID-19) Situation Report – 73* (Apr. 3, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2.

[13]   *See id*. (Data from clinical and virologic studies that have collected repeated biological samples from confirmed patients provide evidence that shedding of the COVID-19 virus is highest in the upper respiratory tract (nose and throat) early in the course of the disease.  That is, within the first three days from onset of symptoms.  Preliminary data suggests that people may be more contagious around the time of symptom onset as compared to later on in the disease.).

[14]   *See id*.

symptomatic case can occur before symptom onset.  Pre-symptomatic transmission still requires the virus to be spread through infectious droplets or touching contaminated surfaces.[15]

28.    An individual who does not develop symptoms – known as an asymptomatic case of COVID-19 – can still transmit the virus to another.  Though there are few documented cases reported, it does not exclude the possibility that it has or may have occurred.[16]

29.    Not only is COVID-19 transmitted via human-to-human contact, but the WHO and scientific studies have confirmed that the virus can live on contaminated objects or surfaces.  According to a study in *The New England Journal of Medicine*, COVID-19 was detectable in aerosols for up to 3 hours, up to 4 hours on copper, up to 24 hours on cardboard, and up to 2-3 days on plastic and stainless steel.[17]  All of these materials are used in the preparation and service of food by restaurants.  The results of the study suggest that individuals could get COVID-19 through indirect contact with surfaces or objects used by an infected person, whether or not they were symptomatic.

---

[15]  *See Id.* (In a small number of case reports and studies, pre-symptomatic transmission has been documented through contact tracing efforts and enhanced investigation of clusters of confirmed cases. This is supported by data suggesting that some people can test positive for COVID-19 from 1-3 days before they develop symptoms. Thus, it is possible that people infected with COVID-19 can transmit the virus before significant symptoms develop.).

[16]  *See Id.*

[17]  *See* News Release, National Institutes of Health, *New coronavirus stable for hours on surfaces* (Mar. 17, 2020), https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces; *see also* World Health Organization, *Modes of transmission of virus causing COVID-19: implications for IPC* (Mar. 29, 2020), https://www.who.int/news-room/commentaries/detail/modes-of-transmission-of-virus-causing-covid-19-implications-for-ipc-precaution-recommendations  (Airborne transmission of COVID-19 "may be possible in specific circumstances and settings in which procedures or support treatments that generate aerosols are performed; *i.e.*, endotracheal intubation, bronchoscopy, open suctioning, administration of nebulized treatment, manual ventilation before intubation, turning the patient to the prone position, disconnecting the patient from the ventilator, non-invasive positive-pressure ventilation, tracheostomy, and cardiopulmonary resuscitation.").

30.     The *Journal of Hospital Infection* has found that human coronaviruses, such as SARS-CoV and MERS-CoV, can remain infectious on inanimate surfaces at room temperature for up to nine days.[18] At a temperature of 30 degrees Celsius or more, the duration of persistence is shorter.  Contamination of frequently touched surfaces is, therefore, a potential source of viral transmission.[19]  Though this study was not conclusive as to COVID-19, scientists are still grappling with the implications.

31.     On March 27, 2020, the CDC released a report entitled "Public Health Responses to COVID-19 Outbreaks on Cruise Ships – Worldwide, February - March 2020."[20]  The report detailed how, during this time frame, COVID-19 outbreaks associated with three different cruise ship voyages caused over 800 confirmed cases and 10 deaths.[21]  Of the individuals tested, a high proportion were found to be

---

[18] *See* G. Kampf et al., Journal of Hospital Infection, *Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents,* (Jan. 31, 2020), https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820%2930046-3.

[19] *See id.* (Although the viral load of coronaviruses on inanimate surfaces is not known during an outbreak situation, it seems plausible to reduce the viral load on surfaces by disinfection, especially of frequently touched surfaces in the immediate area surrounding a patient where the highest viral load can be expected.  The WHO recommends ensuring that "environmental cleaning and disinfection procedures are followed consistently and correctly.").

[20] *See* Leah F. Moriarty, MPH, Centers for Disease Control and Prevention, *Public Health Responses to COVID-19 Outbreaks on Cruise Ships - Worldwide, February - March 2020* (Mar. 27, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm?s_cid= mm6912e3_w.

[21] *See id.* ("During February 7-23, 2020, the largest cluster of COVID-19 cases outside mainland China occurred on the Diamond Princess cruise ship, which was quarantined in the port of Yokohama, Japan, on February 3. . . . On March 6, cases of COVID-19 were identified in persons on the Grand Princess cruise ship off the coast of California; that ship was subsequently quarantined. By March 17, confirmed cases of COVID-19 had been associated with at least 25 additional cruise ship voyages. On February 21, CDC recommended avoiding travel on cruise ships in Southeast Asia; on March 8, this recommendation was broadened to include deferring all cruise ship travel worldwide for those with underlying health conditions and for persons [over] 65 years. On March 13, the Cruise Lines International Association announced a 30-day voluntary suspension of cruise operations in the United States. CDC issued a level 3 travel warning on March 17, recommending that all cruise travel be deferred worldwide.").

asymptomatic, which may explain the high rate of transmission on cruise ships. Further, COVID-19 was identified on a variety of surfaces in cabins of both symptomatic and asymptomatic infected passengers up to 17 days after cabins were vacated on the Diamond Princess cruise line, but before disinfection procedures had been conducted.[22]  The CDC study noted that more studies are required to understand the perpetuation of transmission, but what is clear is the uncertainty around COVID-19 and its implications for the lawful and safe functioning of a variety of businesses, most significantly, food service businesses.

32.    Without a vaccine to protect against COVID-19, effective control of the outbreak relies on measures designed to reduce human-to-human and surface-to-human exposure.  Recent information on the CDC's website provides that COVID-19 spreads when people are within six feet of each other or when a person comes in contact with a surface or object that has the virus on it.[23] Various other sources state that close contact with a person with the virus or surfaces where the virus is found can transmit the virus.[24]

---

[22]  *See id*. ("Cruise ships are often settings for outbreaks of infectious diseases because of their closed environment, contact between travelers from many countries, and crew transfers between ships. On the Diamond Princess, transmission largely occurred among passengers before quarantine was implemented, whereas crew infections peaked after quarantine. . . .  On the Grand Princess, crew members were likely infected on voyage A and then transmitted [COVID-19] to passengers on voyage B. The results of testing of passengers and crew on board the Diamond Princess demonstrated a high proportion (46.5%) of asymptomatic infections at the time of testing. Available statistical models of the Diamond Princess outbreak suggest that 17.9% of infected persons never developed symptoms. . . . A high proportion of asymptomatic infections could partially explain the high attack rate among cruise ship passengers and crew. . . .  Although these data cannot be used to determine whether transmission occurred from contaminated surfaces, further study of fomite transmission of [COVID-19] aboard cruise ships is warranted.").

[23]  *See* Centers for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-COVID-spreads.html (last visited Apr. 27, 2020).

[24]  *See* G. Kampf et al., Journal of Hospital Infection, *Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents,* (Jan. 31, 2020), https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820%2930046-3 (remains infectious from 2 hours to 28 days depending on conditions); *see also* Nina Bai, *Why One Test May Not Be Enough*, University of

- 10 -

33.     The secondary exposure of humans to contaminated surfaces is particularly acute in places where the public gathers to socialize, eat, drink, shop, find entertainment, and recreate.  This is why the CDC recommends that in viral outbreaks individuals who are infected stay at home and those who are not sick engage in preventive measures such as constant hand washing and avoiding activities that would bring them into the close proximity of people with the virus or surfaces where the virus may reside.  However, because these recommendations have proven ineffective to minimize the spread of COVID-19, containment efforts have led to civil authorities issuing orders closing non-essential business establishments, including restaurants, bars, hotels, theaters, personal care salons, gyms, and schools, and mandating social distancing among the population.  This has caused the cancelation of sporting events, parades, and concerts, the closure of amusement parks, and substantial travel restrictions.   In addition, to conserve medical supplies, orders have been issued prohibiting the performance of non-urgent or non-emergency elective procedures and surgeries, forcing the suspension of operations at many medical, surgical, therapeutic, and dental practices.

34.     On March 4, 2020, California Governor Gavin Newsom declared a state of emergency statewide.  On March 12, 2020, Gov. Newsom issued an executive order directing California residents to cancel large non-essential gatherings.  On March 19, 2020, Gov. Newsom issued Executive Order N-33-20, which required all residents to stay home except as needed to maintain continuity of operations of the federal critical infrastructure sectors.  In addition, on March 16, 2020, the Mayor of the City of San Diego issued Executive Order No. 2020-1, prohibiting any gathering

---

California     San     Francisco     (Feb.     13,     2020), https://www.ucsf.edu/news/2020/02/416671/how-new-coronavirus-spreads-and-progresses-and-why-one-test-may-not-be-enough (door knobs and table tops can contain the virus); Heather Murphy, *Surfaces? Sneezes? Sex? How the Coronavirus Can and Cannot Spread*, N.Y. Times (Mar. 19, 2020), https://www.nytimes.com/2020/03/02/health/coronavirus-how-it-spreads.html (virus can remain on metal, glass and plastic for several days).

1   of 50 or more people and discouraging all non-essential gatherings of any size. The

2   Mayor's executive order has since been extended until April 30, 2020.

3       35.   In addition to California, all but 6 states have enacted a COVID-19 Civil

4   Authority Order, including but not limited to "stay-at-home" or "shelter-in-place"

5   orders; 35 states have closed all non-essential businesses with other states enacting

6   measures to curtail business operations; all 50 states have closed schools; and all but

7   one state has closed restaurants and bars for services other than take-out and

8   delivery.[25]

9   **B.**     **Defendants' Standard Commercial Property Insurance Policies**

10       36.   Hartford's insurance policies issued to plaintiff and other Class members

11   are standard commercial property polices that cover loss or damage to the covered

12   premises resulting from all risks other than those expressly excluded.

13       37.   Plaintiff's Hartford Policy, as well as the policies of other Class

14   members, is a standard form used by Hartford for all insureds with applicable

15   coverage.

16       38.   Among the coverages provided by Plaintiff's Hartford Policy was

17   business interruption insurance, which, generally, would indemnify plaintiff for lost

18   income and profits if its business was shut down.

19       39.   Pigment's Special Property Coverage Form, Form SS 00 07 07 05,

20   provided coverage as follows:

21   **Business Income**

22     (1)   We will pay for the actual loss of Business Income you sustain

23         due to the necessary suspension of your "operations" during the "period of restoration." The suspension must be caused by direct

24         physical loss of or physical damage to property at the "scheduled premises", including personal property in the open (or in a

25         vehicle) within 1,000 feet of the "scheduled premises", caused by or resulting from a Covered Cause of Loss.

26

27   [25] *See* Kaiser Family Foundation, *State Data and Policy Actions to Address Coronavirus* (Apr. 27, 2020), https://www.kff.org/health-costs/issue-brief/state-data-

28   and-policy-actions-to-address- coronavirus/.

40.     Pigment's Special Property Coverage Form, Form SS 00 07 07 05, provided coverage as follows:

**Civil Authority**

(1)     This insurance is extended to apply to the actual loss of Business Income you sustain when access to your "scheduled premises" is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of your "scheduled premises."

41.     In addition, Pigment's Special Property Coverage Form, Form SS 00 07 07 05, provided coverage as follows:

**Extra Expense**

(1)     We will pay reasonable and necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or physical damage to property at the "scheduled premises", including personal property in the open (or in a vehicle) within 1,000 feet, caused by or resulting from a Covered Cause of Loss.

42.     Under Pigment's Special Property Coverage Form, Form SS 00 07 07 05, Business Income is defined as:

(a)     Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no direct physical loss or physical damage had occurred; and

(b)     Continuing normal operating expenses incurred, including payroll.

43.     Pigment's Special Property Coverage Form, Form SS 00 07 07 05, defined Extra Expense as follows:

(a)     To avoid or minimize the suspension of business and to continue "operations":

(i)     At the "scheduled premises"; or

(ii)    At replacement premises or at temporary locations, including:

(aa)    Relocation expenses; and

(bb)    Cost to equip and operate the replacement or temporary location, other than those costs necessary to repair or to replace damaged stock and equipment.

(b)    To minimize the suspension of business if you cannot continue "operations."

(c)    (i)    To repair or replace any property; or

        (ii)    To research, replace or restore the lost information on damaged "valuable papers and records"; to the extent it reduces the amount of loss that otherwise would have been payable under this Additional Coverage or Additional Coverage o., Business Income.

            We will only pay for Extra Expense that occurs within 12 consecutive months after the date of direct physical loss or physical damage. This Additional Coverage is not subject to the Limits of Insurance.

44. Pigment's Special Property Coverage Form provides coverage for direct physical loss of or physical damage to Covered Property at the premises described in the Declarations (also called "scheduled premises" in this policy) caused by or resulting from a Covered Cause of Loss.

45. The interruption of plaintiff's and other Class members' businesses was not caused by any of the exclusions set forth in the applicable policies.

46. Pigment's policy contains Limited Fungi, Bacteria or Virus Coverage, which excludes remediation measures for a rot, bacteria or virus infestation at the insured property, but covers such an infestation if it is caused by an otherwise covered peril.

47. Plaintiff and all Class members have suffered a direct physical loss of and damage to their property because they have been unable to use their property for its intended purpose.

48. Plaintiff's Fungi, Bacteria or Virus Coverage provision in its policy does not exclude plaintiff's losses because the efficient proximate cause of losses was precautionary measures taken by its state to prevent the spread of COVID-19 in the future, not because coronavirus was found on or around plaintiff's insured property.

49. Notwithstanding the foregoing, by way of letter dated March 30, 2020, Hartford denied Pigment's claim for business interruption losses.

**C.     The COVID-19 Pandemic Has Affected Policyholders Nationwide**

50.     COVID-19 is physically impacting private commercial property throughout the United States and the State of California, threatening the survival of thousands of restaurants, retail establishments, and other businesses that have had their business operations suspended or curtailed indefinitely by order of civil authorities.

51.     Hartford does not intend to cover losses caused by the COVID-19 pandemic as part of business interruption coverage.  As aforementioned, Hartford denied plaintiff's claim by way of a letter dated March 30, 2020, even though Pigment was forced to close its retail locations due to the COVID-19 Civil Authority Orders. On information and belief, Hartford has denied similar claims by other Class members.

52.     As a result, many small businesses that maintain commercial multi-peril insurance policies with business interruption coverage will have significant uninsured losses absent declaratory relief from this Court.

53.     A declaratory judgment determining that the business income loss and extra expense coverage provided in standard Hartford commercial property insurance policies applies to the suspension, curtailment, and interruption of business operations resulting from measures put into place by civil authorities is necessary to prevent plaintiff and similarly situated Class members from being denied critical coverage for which they have paid premiums.

**CLASS ALLEGATIONS**

54.     Plaintiff brings this lawsuit pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) individually and on behalf of all other persons similarly situated.

55.     The Nationwide Class is defined as:

All persons and entities who have entered into a standard commercial property insurance policy with a Hartford insurance carrier to insure property in the United States, where such policy provides for business income loss and extra expense coverage and does not exclude coverage

for pandemics, and who have suffered losses due to measures put in place by a COVID-19 Civil Authority Order.

The California Sub-Class is defined as:

All persons and entities who have entered into a standard commercial property insurance policy with a Hartford insurance carrier to insure property in California, where such policy provides for business income loss and extra expense coverage and does not exclude coverage for pandemics, and who have suffered losses due to measures put in place by a COVID-19 Civil Authority Order.

Excluded from each of the Classes are the Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

56.     Plaintiff reserves the right to modify, expand, or amend the definitions of the proposed Classes following the discovery period and before the Court determines whether class certification is appropriate.

57.     Certification of plaintiff's claims for class-wide treatment is appropriate because plaintiff can prove the elements of its claims on a class-wide basis using the same evidence as would prove those elements in individual actions alleging the same claims.

**Numerosity**

58.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1).  The Classes number at least in the hundreds and consists of geographically dispersed business entities who are insured for business interruption losses. Hartford sells many insurance policies nationwide and in the State of California and, therefore, joinder of the Class members is impracticable.

59.     The identity of Class members is ascertainable, as the names and addresses of all Class members can be identified in Hartford's or their agent's books and records.  Plaintiff anticipates providing appropriate notice to the certified Classes

in compliance with Fed. R. Civ. P. 23(c)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

**Typicality**

60.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because plaintiff's claims are typical of the claims of each of the Class members, as all Class members were and are similarly affected and their claims arise from the same standard policy provisions entered into with Hartford.  Each Class member's insurance policy contains the same form providing coverage for business income loss.  None of the forms exclude coverage due to a governmental action intended to reduce the effect of the ongoing global pandemic.  As a result, a declaratory judgment as to the rights and obligations under plaintiff's policy will address the rights and obligations of all Class members.

**Adequacy of Representation**

61.     Plaintiff is committed to prosecuting the action, will fairly and adequately protect the interests of Class members, and has retained counsel competent and experienced in class action litigation, including litigation relating to insurance policies.  Plaintiff has no interests antagonistic to or in conflict with other Class members.  Plaintiff anticipates no difficulty in the management of this litigation as a class action.

**Commonality**

62.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) because there are questions of law and fact that are common to each of the Classes.  These common questions predominate over any questions affecting only individual Class members.  The questions of law and fact common to the Classes include, but are not limited to:

(a)     Whether there is an actual controversy between plaintiff and Hartford as to the rights, duties, responsibilities and obligations of the parties under

the business interruption coverage provisions in standard commercial property insurance policies;

(b)　Whether measures to reduce the spread of the COVID-19 pandemic are excluded from plaintiff's and Class members' standard commercial property insurance policies;

(c)　Whether the measures put in place by civil authorities to stop the spread of COVID-19 caused physical loss or damage to the covered commercial property;

(d)　Whether Hartford has repudiated and breached the insurance policies with business interruption coverage by denying or intending to deny claims for coverage; and

(e)　Whether plaintiff and Class members suffered damages as a result of the breach by Hartford.

**Superiority/Predominance**

63.　This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3).  A class action is superior to other available methods for the fair and efficient adjudication of the rights of the Class members.   The joinder of individual Class members is impracticable because of the vast number of Class members who have purchased commercial property insurance policies from Defendants.

64.　Because a declaratory judgment as to the rights and obligations under the uniform insurance policies will apply to all Class members, most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions.   The burden imposed on the judicial system by individual litigation, and to Hartford, by even a small fraction of the Class members, would be enormous.

65.　In comparison to piecemeal litigation, class action litigation presents far fewer management difficulties, conserves the resources of both the judiciary and the parties far better, and protects the rights of each Class member far more effectively.

The benefits to the legitimate interests of the parties, the Court, and the public resulting from class action litigation substantially outweigh the expenses, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation. Class adjudication is superior to other alternatives under Fed. R. Civ. P. 23(b)(3)(D). Class treatment will also avoid the substantial risk of inconsistent factual and legal determinations on the many issues in this lawsuit.

66.     Plaintiff knows of no obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.  Rule 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges.  The Court may, on motion of plaintiff or on its own determination, certify nationwide and statewide classes for claims sharing common legal questions; use the provisions of Rule 23(c)(4) to certify particular claims, issues, or common questions of law or of fact for class-wide adjudication; certify and adjudicate bellwether class claims; and use Rule 23(c)(5) to divide any class into subclasses.

**COUNT I**

**DECLARATORY JUDGMENT – BUSINESS INCOME COVERAGE**
**(Claim Brought on Behalf of the Nationwide Class and California Sub-Class)**

67.     Plaintiff repeats the allegations set forth above as if fully set forth herein.

68.     Plaintiff brings this Count individually and on behalf of the other members of the Nationwide Class and California Sub-Class.

69.     Plaintiff's Hartford Policy, as well as those of the other Class members, is a contract under which Hartford was paid premiums in exchange for its contractual agreement to pay plaintiff's, and the other Class members', losses for claims covered by the policy.

70.     As part of standard business interruption coverage, Hartford agreed to pay for insureds' loss of Business Income sustained due to the necessary suspension of its operations during the "period of restoration."  Hartford also agreed to pay its

insureds' actual loss of Business Income sustained due to the necessary "suspension of [their] operations" during the "period of restoration" caused by direct physical loss or damage. "Business Income" under the policies means the "Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred," as well as "[c]ontinuing normal operating expenses incurred, including payroll."

71.    The COVID-19 Civil Authority Orders caused direct physical loss and damage to plaintiff's and the other Class members' Covered Properties, requiring suspension of operations at the Covered Properties. Accordingly, losses caused by the COVID-19 Civil Authority Orders triggered the Business Income provision of plaintiff's and the other Class members' Hartford policies.

72.    Plaintiff and other Class members have complied with all applicable provisions of the policies and/or those provisions have been waived by Hartford or Hartford is estopped from asserting them. Yet Hartford has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms and has wrongfully and illegally refused to provide the coverage to which plaintiff and Class members are entitled.

73.    Hartford has denied plaintiff's and other Class members' claims for business interruption losses caused by COVID-19 Civil Authority Orders on a uniform and class-wide basis without individual bases or investigations, so the Court can render declaratory judgment irrespective of whether a particular Class member has filed a claim.

74.    An actual case or controversy exists regarding plaintiff's and the other Class members' rights and Hartford's obligations under the policies to pay for losses incurred by plaintiff and the other Class members in connection with the business interruption caused by COVID-19 Civil Authority Orders.

75.    Pursuant to 28 U.S.C. §2201, plaintiff and other Class members seek a declaratory judgment from this Court as follows:

i. Plaintiff's and the other Class members' Business Income losses incurred due to COVID-19 Civil Authority Orders are insured losses under their Hartford policies; and

ii. Hartford is obligated to pay plaintiff and other Class members for the full amount of their Business Income losses (up to the maximum allowable amount under the policies) incurred in connection with the COVID-19 Civil Authority Orders during the period of restoration and the necessary interruption of their businesses stemming therefrom.

## COUNT II

### BREACH OF CONTRACT – BUSINESS INCOME COVERAGE
### (Claim Brought on Behalf of the Nationwide Class and California Sub-Class)

76. Plaintiff repeats the allegations set forth above as if fully set forth herein.

77. Plaintiff brings this Count individually and on behalf of the other members of the Nationwide Class and California Sub-Class.

78. Plaintiff's Hartford Policy, as well as those of other Class members, is a contract under which Hartford was paid premiums in exchange for its promise to pay plaintiff's, and the other Class members', losses for claims covered by the policies.

79. As part of standard business interruption coverage, Hartford agreed to pay for insureds' actual loss of Business Income sustained due to the necessary suspension of its operations during the "period of restoration." Hartford also agreed to pay its insureds' actual loss of Business Income sustained due to the necessary "suspension of [their] operations" during the "period of restoration" caused by direct physical loss or damage. "Business Income" under the policies means the "Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred," as well as "[c]ontinuing normal operating expenses incurred, including payroll."

80. The COVID-19 Civil Authority Orders caused direct physical loss and damage to plaintiff's and the other Class members' Covered Properties, requiring suspension of operations at the Covered Properties. Accordingly, losses caused by the COVID-19 Civil Authority Orders triggered the Business Income provision of plaintiff's and the other Class members' Hartford policies.

81.     Plaintiff and the other Class members have complied with all applicable provisions of their policies and/or those provisions have been waived by Hartford and/or Hartford is estopped from asserting them.  Yet Hartford has abrogated its insurance coverage obligations under the policies' clear and unambiguous terms.

82.     By denying coverage for any Business Income loss incurred by plaintiff or other Class members as a result of the COVID-19 Civil Authority Orders, Hartford has breached its coverage obligations under the policies.

83.     As a result of Hartford's breaches of contract, plaintiff and other Class members have sustained substantial damages for which Hartford is liable in an amount to be established at trial.

## COUNT III

### DECLARATORY JUDGMENT – CIVIL AUTHORITY COVERAGE
**(Claim Brought on Behalf of the Nationwide Class and California Sub-Class)**

84.     Plaintiff repeats the allegations set forth above as if fully set forth herein.

85.     Plaintiff brings this Count individually and on behalf of the other members of the Nationwide Class and California Sub-Class.

86.     Plaintiff's Hartford Policy, as well as those of other Class members, is a contract under which Hartford was paid premiums in exchange for its promise to pay plaintiff's, and other Class members', losses for claims covered by the policy.

87.     Plaintiff's Hartford Policy provided for "Civil Authority" coverage, which promises to pay "the actual loss of Business Income you sustain when access to your 'scheduled premises' is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of your 'scheduled premises.'"  Accordingly, the COVID-19 Civil Authority Orders triggered the Civil Authority provision under plaintiff's and the other Class members' Hartford policies.

88.     Plaintiff and Class members have complied with all applicable provisions of the policies and/or those provisions have been waived by Hartford and/or Hartford

is estopped from asserting them.  Yet Hartford has abrogated its insurance coverage obligations under the policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which plaintiff and Class members are entitled.

89.     Hartford has denied claims related to COVID-19 on a uniform and class wide basis without individual bases or investigations, so the Court can render declaratory judgment irrespective of whether a particular Class member has filed a claim.

90.     An actual case or controversy exists regarding plaintiff's and other Class members' rights and Hartford's obligations under the policies to reimburse plaintiff and other Class members for the full amount of covered Civil Authority losses incurred by plaintiff and other Class members in connection with COVID-19 Civil Authority Orders and the necessary interruption of their businesses stemming therefrom.

91.     Pursuant to 28 U.S.C. §2201, plaintiff and other Class members seek a declaratory judgment from this Court declaring the following:

i.      Plaintiff's and other Class members' Civil Authority losses incurred in connection with COVID-19 Civil Authority Orders and the necessary interruption of their businesses stemming therefrom are insured losses under their policies; and

ii.     Hartford is obligated to pay plaintiff and other Class members for the full amount of their Civil Authority losses (up to the maximum allowable amount under the policies) incurred in connection with the COVID-19 Civil Authority Orders and the necessary interruption of their businesses stemming therefrom.

## COUNT IV

## BREACH OF CONTRACT – CIVIL AUTHORITY COVERAGE
## (Claim Brought on Behalf of the Nationwide Class and California Sub-Class)

92.     Plaintiff repeats the allegations set forth above as if fully set forth herein.

93.     Plaintiff brings this Count individually and on behalf of the other members of the Nationwide Class and California Sub-Class.

- 23 -

94.     Plaintiff's Hartford Policy, as well as those of other Class members, is a contract under which Hartford was paid premiums in exchange for its promise to pay plaintiff's, and the other Class Members', losses for claims covered by the policy.

95.     Plaintiff's Hartford Policy provided for "Civil Authority" coverage, which promises to pay "the actual loss of Business Income you sustain when access to your 'scheduled premises' is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of your 'scheduled premises.'" Accordingly, the COVID-19 Civil Authority Orders triggered the Civil Authority provision under plaintiff's and the other Class members' Hartford policies.

96.     Plaintiff and the other Class members have complied with all applicable provisions of the policies and/or those provisions have been waived by Hartford and/or Hartford is estopped from asserting them.  Yet Hartford has abrogated its insurance coverage obligations under the policies' clear and unambiguous terms.

97.     By denying coverage for any business losses incurred by plaintiff and other Class members in connection with the COVID-19 Civil Authority Orders, Hartford has breached its coverage obligations under the policies.

98.     As a result of Hartford's breaches of contract, plaintiff and other Class members have sustained substantial damages for which Hartford is liable in an amount to be established at trial.

**COUNT V**

**DECLARATORY JUDGMENT – EXTRA EXPENSE COVERAGE**
**(Claim Brought on Behalf of the Nationwide Class and California Sub-Class)**

99.     Plaintiff repeats the allegations set forth above as if fully set forth herein.

100.   Plaintiff brings this Count individually and on behalf of the other members of the Nationwide Class and the California Sub-Class.

101.   Plaintiff's Hartford Policy, as well as those of other Class Members, is a contract under which Hartford was paid premiums in exchange for its promise to pay plaintiff's, and other Class members', losses for claims covered by the policies.

102.   Plaintiff's Hartford Policy provided that Hartford would pay necessary Extra Expense that its insureds incur during the "period of restoration" that the insureds would not have incurred if there had been no direct physical loss or damage to the described premises.  "Extra Expense" means expenses "[t]o avoid or minimize the suspension of business and to continue 'operations,'" and to repair or replace property.  Due to the COVID-19 Civil Authority Orders, plaintiff and other Class members incurred Extra Expense at their Covered Properties.

103.   Plaintiff and other Class members have complied with all applicable provisions of the policies and/or those provisions have been waived by Hartford and/or Hartford is estopped from asserting them.  Yet Hartford has abrogated its insurance coverage obligations under the policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which plaintiff and Class members are entitled.

104.   Hartford has denied claims related to COVID-19 on a uniform and class-wide basis without individual bases or investigations, so the Court can render declaratory judgment irrespective of whether a particular Class member has filed a claim.

105.   An actual case or controversy exists regarding plaintiff's and other Class members' rights and Hartford's obligations under the policies to reimburse plaintiff and the other Class members for the full amount of Extra Expense losses incurred by plaintiff and Class members in connection with COVID-19 Civil Authority Orders and the necessary interruption of their businesses stemming therefrom.

106.   Pursuant to 28 U.S.C. §2201, plaintiff and other Class members seek a declaratory judgment from this Court declaring the following:

i.      Plaintiff's and other Class members' Extra Expense losses incurred in connection with the COVID-19 Civil Authority Orders and the necessary interruption of their businesses stemming therefrom are insured losses under their policies; and

ii.    Hartford is obligated to pay plaintiff and other Class members for the full amount of their Extra Expenses losses (up to the maximum allowable amount under the policies) in connection with the COVID-19 Civil Authority Orders and the necessary interruption of their businesses stemming therefrom.

## COUNT VI

### BREACH OF CONTRACT – EXTRA EXPENSE COVERAGE
### (Claim Brought on Behalf of the Nationwide Class and California Sub-Class)

107.   Plaintiff repeats the allegations set forth above as if fully set forth herein.

108.   Plaintiff brings this Count individually and on behalf of the other members of the Nationwide Class and California Sub-Class.

109.   Plaintiff's Hartford Policy, as well as those of the other Class members, is a contract under which Hartford was paid premiums in exchange for its promise to pay plaintiff's, and the other Class members', losses for claims covered by the policy.

110.   Plaintiff's Hartford Policy provided that Hartford agreed to pay necessary Extra Expense that it incurred during the "period of restoration" that would not have incurred if there had been no direct physical loss or damage to the described premises. "Extra Expense" means expenses "[t]o avoid or minimize the suspension of business and to continue 'operations,'" and to repair or replace property.  Due to the COVID-19 Civil Authority Orders, plaintiff and other Class members incurred Extra Expense at their Covered Properties.

111.   Plaintiff and other Class members have complied with all applicable provisions of the policies and/or those provisions have been waived by Hartford and/or Hartford is estopped from asserting them.  Yet Hartford has abrogated its insurance coverage obligations under the policies' clear and unambiguous terms.

112.   By denying coverage for any business losses incurred by plaintiff and other Class members in connection with the COVID-19 Civil Authority Orders, Hartford has breached its coverage obligations under the policies.

113.   As a result of Hartford's breaches of the policies, plaintiff and the other Class members have sustained substantial damages for which Hartford is liable in an amount to be established at trial.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, individually and on behalf of all similarly situated individuals and entities, prays for relief and judgment against Defendants as follows:

A.   Determining that this action is a proper class action under one or more provisions of Federal Rule of Civil Procedure 23, appointing plaintiff to serve as a Class Representative and appointing its counsel to serve as Class Counsel;

B.   Issuing a Declaratory Judgment declaring the parties' rights and obligations under the insurance policy provisions at issue;

C.   Awarding plaintiff and the Classes compensatory damages against Defendants, jointly and severally, for all damages sustained as a result of Defendants' breach of the policies in an amount to be proven at trial, including interest thereon;

D.   Awarding plaintiff and the Classes pre-judgment and post-judgment interest as well as reasonable attorneys' fees and expenses incurred in this action; and

E.   Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED:  April 28, 2020

ROBBINS GELLER RUDMAN
 & DOWD LLP
BENNY C. GOODMAN III
RACHEL L. JENSEN


*s/Rachel L. Jensen*
RACHEL L. JENSEN

- 27 -

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
bennyg@rgrdlaw.com
racheli@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
PAUL J. GELLER
STUART A. DAVIDSON
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com
sdavidson@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

CARELLA, BYRNE, CECCHI,
  OLSTEIN, BRODY & AGNELLO, P.C.
JAMES E. CECCHI
LINDSEY H. TAYLOR
5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)
jcecchi@carellabyrne.com
ltaylor@carellabyrne.com

SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
STEPHEN A. WEISS
77 Water Street, 8th Floor
New York, NY  10005
Telephone:  212/584-0700
212/584-0799 (fax)
cseeger@seegerweiss.com
sweiss@seegerweiss.com

Attorneys for Plaintiff

- 28 -